

FILED
CLERK, U.S. DISTRICT COURT

AUG - 3 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2004 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 03-398(A)-RMT |
| | ) | |
| Plaintiff, | ) | FIRST SUPERSEDING |
| | ) | |
| v. | ) | I N D I C T M E N T |
| | ) | |
| GALEB MIZYED, | ) | [21 U.S.C. §§ 846, 841(a)(1), |
| MIGUEL SARABIA, | ) | 841(b)(1)(A) and 841(c)(2); 18 |
| aka Edward Cortez, | ) | U.S.C. § 2: Conspiracy to |
| aka Charlie, | ) | Illegally Distribute a Listed |
| HISHAM HAMMAD, | ) | Chemical and to Aid and Abet the |
| TARIQ HAMMAD, | ) | Manufacture of Methamphetamine; |
| DAVID GREGORY WALLACE, | ) | 21 U.S.C. § 841(c)(2): Illegal |
| AMIR FAKOURY, | ) | Distribution of a Listed |
| RAMIRO MAGANA, | ) | Chemical; 18 U.S.C. §§ 1956(h), |
| aka Moreno, | ) | 1956(a)(1): Conspiracy to |
| SAMUEL BAASCH, | ) | Launder Money; 18 U.S.C. § 1957: |
| HUSSEIN GHACHAM, | ) | Money Laundering; 21 U.S.C. |
| aka Chaparro, | ) | § 848(a): Continuing Criminal |
| BRIAN CARPENTER, | ) | Enterprise; 18 U.S.C. § 3: |
| IBRAHIM BALSHEH, | ) | Accessory After the Fact] |
| JEAN-ROBERT GASTON, | ) | |
| ATIYEH ATIYENSALEM, | ) | |
| HASAN RASOUL, | ) | |
| MIEKO CHONIECE JACKSON, | ) | |
| KENDALL JAMES ROBBINS, | ) | |
| CHERYL DRENNEN, and | ) | |
| GHALIA MIZYED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PAH:CB:pah



(400)

The Grand Jury charges:

COUNT ONE

[21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A) and 841(c)(2);

18 U.S.C. § 2]

A.   UNDERLINE OBJECTS OF THE CONSPIRACY

Beginning on a date unknown and continuing until on or about April 20, 2003, in Los Angeles and San Bernardino Counties, within the Central District of California and elsewhere, defendants GALEB MIZYED ("MIZYED"), MIGUEL SARABIA, also known as ("aka") Edward Cortez, aka Charlie ("SARABIA"), HISHAM HAMMAD ("H. HAMMAD"), TARIQ HAMMAD ("T. HAMMAD"), DAVID GREGORY WALLACE ("WALLACE"), AMIR FAKOURY ("FAKOURY"), RAMIRO MAGANA, aka Moreno ("MAGANA"), SAMUEL BAASCH ("BAASCH"), HUSSEIN GHACHAM, aka Chaparro ("GHACHAM"), BRIAN CARPENTER ("CARPENTER"), IBRAHIM BALSHEH ("BALSHEH"), JEAN-ROBERT GASTON ("GASTON"), MIEKO CHONIECE JACKSON ("JACKSON"), and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to commit the following offenses against the United States:

1.    To distribute pseudoephedrine, a list I chemical, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(c)(2).

2.    To aid and abet the manufacture of more than 500 grams, that is, at least 15 kilograms, of a mixture or substance

- 2 -

1  containing a detectable amount of methamphetamine, a schedule II

2  controlled substance, in violation of Title 21, United States

3  Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United

4  States Code, Section 2.

5  B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

6        ACCOMPLISHED

7        The objects of the conspiracy were to be accomplished in

8  substance as follows:

9        1.    Defendants MIZYED and T. HAMMAD would purchase large

10  quantities of pseudoephedrine, a list I chemical used to

11  manufacture methamphetamine.

12        2.    Defendants BALSHEH and GASTON would arrange to smuggle

13  the pseudoephedrine into the United States.

14        3.    Defendant MIZYED would receive large quantities of

15  pseudoephedrine from defendants BALSHEH and GASTON.

16        4.    Defendant CARPENTER would transport large quantities of

17  pseudoephedrine into the United States from Canada.

18        5.    Defendants H. HAMMAD and JACKSON would make

19  arrangements with defendant MIZYED to transport and store the

20  pseudoephedrine once it arrived in the United States.

21        6.    Defendant WALLACE would store the pseudoephedrine in

22  storage lockers.

23        7.    Defendant MIZYED would sell the pseudoephedrine to

24  individuals manufacturing methamphetamine.

25        8.    Defendants SARABIA, FAKOURY, MAGANA, BAASCH and GHACHAM

26  would purchase the pseudoephedrine from defendant MIZYED.

27

28

C.    OVERT ACTS

    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants MIZYED, SARABIA, H. HAMMAD, T. HAMMAD, WALLACE, FAKOURY, MAGANA, BAASCH, GHACHAM, CARPENTER, BALSHEH, GASTON, JACKSON, and others known and unknown to the Grand Jury, committed various overt acts on or about the following times and dates, within the Central District of California and elsewhere, including but not limited to the following:

    1.    On March 8, 1999, in San Bernardino, California, defendant T. HAMMAD arrived at the AMTRAK train station with an unindicted coconspirator, loaded ten large boxes containing pseudoephedrine into their vehicle and drove to Affordable Mini Storage, 2157 Murchison, Pomona, California.

    2.    On March 8, 1999, in Pomona, California, defendant T. HAMMAD possessed bottles containing approximately 950,000 pseudoephedrine pills, which were disguised inside boxes containing other items.

    3.    Sometime between December 2000 and April 2001, defendant MIZYED and three coconspirators negotiated the purchase and sale of pseudoephedrine at the Ramada Inn, located at 1841 "G" Street, in Ontario, California.

    4.    Sometime between December 2000 and April 2001, defendant MIZYED instructed coconspirator Kimberly Easterling ("Easterling") to deliver boxes of pseudoephedrine to individuals who would use the pseudoephedrine to manufacture methamphetamine.

    5.    Sometime between February 15, 2001 and December 31,

- 4 -

2001, defendant MIZYED and Easterling made deposits totaling approximately $379,710 in United States currency, which were proceeds from the sale of pseudoephedrine, into Easterling's Bank of America account, number 18737-01148.

6.   In May 2001, defendant WALLACE assisted defendant MIZYED in distributing pseudoephedrine to methamphetamine manufacturers.

7.   In June 2001, defendant MIZYED sold multi-case quantities of pseudoephedrine to defendant FAKOURY.

8.   On June 22, 2001, in Rancho Cucamonga, defendant MIZYED sent via wire transfer $2,500 in proceeds from the sale of pseudoephedrine to coconspirator Abdul Quader Mizyed ("A. Mizyed").

9.   In July 2001, defendant MIZYED sold approximately 45 to 50 boxes of pseudoephedrine to defendant SARABIA.

10.   On August 9, 2001, defendants MIZYED and T. HAMMAD instructed coconspirator Mirlo Paez-Calderon ("Paez-Calderon") to rent a storage locker at AIM-ALL Storage, 10005 Arrow Route, Rancho Cucamonga, California (the "Rancho Cucamonga storage location") in order to store pseudoephedrine.

11.   In August 2001, defendant MIZYED sold approximately 40 cases of pseudoephedrine to defendant SARABIA.

12.   On August 15, 2001, in Ontario, California, A. Mizyed possessed $232,316 in United States currency which represented the proceeds from the sale of pseudoephedrine.

13.   In October 2001, defendant MIZYED instructed Easterling to set up a company in Mississippi for defendants MIZYED and T.

- 5 -

HAMMAD that would import water into the United States from Canada and would be used to smuggle large quantities of pseudoephedrine hidden inside the water shipments.

14.   On November 21, 2001, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada hidden in boxes containing water.

15.   On November 21, 2001, coconspirator Khairdin Al Noubani transported approximately 800 cases of pseudoephedrine from Poplarville, Mississippi to Las Vegas, Nevada for defendants MIZYED and T. HAMMAD.

16.   On November 23, 2001, in Las Vegas, Nevada, defendant MIZYED introduced defendant SARABIA to defendant MIZYED's pseudoephedrine trafficking partners.

17.   On December 4, 2001, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada hidden in boxes containing water.

18.   In December 2001, defendant SARABIA purchased 800 cases of pseudoephedrine from defendant MIZYED.

19.   Sometime after January 10, 2002, defendant T. HAMMAD left the United States and placed defendant H. HAMMAD in control of defendant T. HAMMAD's pseudoephedrine trafficking operations.

20.   On January 27, 2002, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada secreted in boxes containing water.

21.   On February 16, 2002, in Sevier County, Utah, defendant H. HAMMAD possessed a suitcase containing approximately $300,000 in United States currency derived from sale of pseudoephedrine.

22. On March 7, 2002, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada hidden in boxes containing water.

23. Sometime after March 7, 2002, in Las Vegas, Nevada, defendant MIZYED instructed defendant JACKSON to transport a load of pseudoephedrine to an apartment in Carson, California.

24. On May 13, 2002, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada hidden in boxes containing water.

25. On June 24, 2002, in Los Angeles, California, defendants MIZYED and SARABIA threatened to harm coconspirator Naser Dareghrayyeb ("Dareghrayyeb") if he did not pay for a prior pseudoephedrine transaction.

26. On July 5, 2002, in Poplarville, Mississippi, Easterling received a shipment of pseudoephedrine from Canada hidden in boxes containing water.

27. On July 9, 2002, defendant WALLACE rented a storage locker to store pseudoephedrine purchased by defendant MIZYED.

28. On July 12, 2002, in Las Vegas, Nevada, defendant MIZYED instructed coconspirator Max Stevenson ("Stevenson") to transport a load of pseudoephedrine to an apartment in Carson, California.

29. In October 2002, defendant JACKSON stored boxes containing pseudoephedrine at 13455 Sumter Street, Fontana, California.

30. On October 24, 2002, defendant JACKSON deposited $5,000 in United States currency into her Washington Mutual Bank ("WMB")

account, number 4404260541.

31.  On October 24, 2002, defendant JACKSON deposited $2,500 in United States currency into her WMB account, number 4456634322.

32.  On October 25, 2002, by telephone, defendant MIZYED told defendant JACKSON that he wanted to stop by the Rancho Cucamonga storage location.

33   On October 25, 2002, by telephone and in coded language, defendant JACKSON told defendant MIZYED that the bag that was going to be exchanged at the bank contained nothing but "20's" (United States currency).

34.  On October 25, 2002, defendant JACKSON deposited $5,000 in United States currency into her WMB account, number 4404260541.

35.  On November 1, 2002, in Ontario, California, defendant MIZYED instructed Easterling and defendant DRENNEN to drive from Ontario, California to Chicago, Illinois to deliver narcotics proceeds to coconspirator Saleh Mizyed ("S. Mizyed").

36.  On November 6, 2002, in Lancaster County, Nebraska, defendant MIZYED instructed coconspirators Dante Frazier and David Williams to deliver approximately 1,920 pounds of pseudoephedrine to defendant MIZYED in Fontana, California.

37.  On November 27, 2002, by telephone and in coded language, Stevenson informed defendant MIZYED that an unknown coconspirator would pick up pseudoephedrine in 20 minutes.

38.  On November 28, 2002, by telephone and in coded language, defendant MIZYED told defendant MAGANA to meet him at a

market in 20 minutes to complete the pseudoephedrine transaction.

39.    On November 29, 2002, by telephone and in coded language, defendant MIZYED informed an unidentified coconspirator that the pseudoephedrine was distributed in bags that contained approximately 17,000 pseudoephedrine pills in each bag.

40.    On November 29, 2002, by telephone and in coded language, defendant MAGANA told defendant MIZYED that he would have the money to purchase pseudoephedrine by the next day.

41.    On November 29, 2002, by telephone and in coded language, defendant MIZYED told Stevenson that he could meet with an unknown coconspirator at 10:00 a.m. the next day.

42.    On November 30, 2002, defendant MIZYED instructed Easterling and defendant DRENNEN to deliver proceeds from the sale of pseudoephedrine to coconspirator S. Mizyed.

43.    On November 30, 2002, at 12:02 p.m., by telephone and in coded language, defendant MIZYED informed defendant BAASCH that he had pseudoephedrine available for sale.

44.    On November 30, 2002, at 12:09 p.m., by telephone and in coded language, defendant MAGANA told defendant MIZYED that defendant MAGANA was still working on getting the proceeds from the sale of pseudoephedrine to defendant MIZYED.

45.    On November 30, 2002, at 12:10 p.m., by telephone and in coded language, defendant BAASCH told defendant MIZYED that he wanted the price of the pseudoephedrine lowered and that he could be ready to purchase the pseudoephedrine in 2 hours.

46.    On November 30, 2002, at 12:18 p.m., by telephone and in coded language, defendant MIZYED informed defendant WALLACE

- 9 -

that the pseudoephedrine buyers were on their way over to pick up the pseudoephedrine.

47.  On November 30, 2002, at 12:27 p.m., by telephone and in coded language, defendant BAASCH told defendant MIZYED that he had $95,000 to purchase pseudoephedrine.

48.  On November 30, 2002, at 1:38 p.m., by telephone and in coded language, defendant MIZYED told defendant BAASCH where he could pick up the pseudoephedrine.

49.  On November 30, 2002, at 2:00 p.m., defendant GHACHAM and two unidentified coconspirators provided Stevenson with a white mini-van taxi that Stevenson drove to the Rancho Cucamonga storage location to pickup the pseudoephedrine.

50.  On November 30, 2002, after leaving the Rancho Cucamonga storage location, Stevenson possessed 616 pounds of pseudoephedrine inside the mini-van taxi.

51.  On December 1, 2002, at 4:38 p.m., by telephone and in coded language, defendant MAGANA assured defendant MIZYED that defendant MIZYED would receive the money for the sale of pseudoephedrine that day.

52.  On December 3, 2002, at 10:40 a.m., by telephone and in coded language, defendant MIZYED told defendant GHACHAM to call him concerning the November 30, 2002 pseudoephedrine seizure with defendant MIZYED.

53.  On December 4, 2002, at 10:56 a.m., by telephone, defendant JACKSON obtained an airline reservation for defendant MIZYED to travel from Los Angeles, California to Chicago, Illinois.

54.  On December 4, 2002, at 11:20 a.m., by telephone and in coded language, defendant MIZYED blamed defendant GHACHAM for the 616 pounds of pseudoephedrine that was seized by law enforcement officers on November 30, 2002.

55.  On December 4, 2002, at 4:21 p.m., by telephone and in coded language, defendant MIZYED informed defendant JACKSON that he did not want to take all the proceeds from the sale of pseudoephedrine back to Chicago, Illinois.

56.  On December 4, 2002, defendant MIZYED and two other unindicted coconspirators possessed of $112,920 in United States currency.

57.  On December 5, 2002, defendant JACKSON deposited $9,000 in United States currency into her WMB account, number 4404260541.

58.  On December 10, 2002, defendant BALSHEH met with S. Mizyed at 3205 Swansea, Unit #15, in Ottawa, Canada.

59.  On December 22, 2002, by telephone and in coded language, A. Mizyed told defendant MIZYED that coconspirator Abdu Jimale Farah ("Farah") needed to speak with defendant MIZYED.

60.  On December 22, 2002, by telephone and in coded language, S. Mizyed told defendant MIZYED that Farah had been paid $20,000, but the pseudoephedrine had not all been delivered.

61.  On December 24, 2002, by telephone and in coded language, defendant MIZYED informed an unindicted coconspirator that he was going to meet an individual who owed him money.

62.  On December 28, 2002, in Des Moines, Iowa, defendant MIZYED and A. Mizyed possessed approximately $101,160 in United

States currency hidden in the rear wheel wells of the vehicle they were driving.

63. On December 30, 2002, by telephone and in coded language, Farah informed defendant MIZYED that he would meet with defendant MIZYED after Farah unloaded the "big load" (pseudoephedrine) the next day.

64. On December 30, 2002, by telephone and in coded language, Paez-Calderon informed defendant MIZYED that someone had stolen her purse containing defendant MIZYED's money from the sale of pseudoephedrine.

65. On December 30, 2002, by telephone and in coded language, Paez-Calderon informed defendant MIZYED that she cancelled the money orders that were stolen.

66. On December 30, 2002, by telephone and in coded language, defendant MIZYED told Paez-Calderon that defendant MAGANA owed him money from the sale of pseudoephedrine.

67. On December 31, 2002, in Ottawa, Ontario, Canada, defendant BALSHEH met with S. Mizyed to negotiate the purchase of pseudoephedrine.

68. On January 3, 2003, in Ontario, Canada, defendant GASTON and an unindicted coconspirator unloaded approximately 85 boxes containing pseudoephedrine into a storage unit at 1525 Sieveright Road, Unit #14 (the "Sieveright location").

69. On January 4, 2003, in Ottawa, Canada, defendant GASTON and an unindicted coconspirator unloaded approximately 81 boxes containing pseudoephedrine into a storage unit at 3105 Hawthorne Building F, Unit #7 (the "Hawthorne location").

70.   On January 5, 2003, defendant MIZYED received from Paez-Calderon a package containing $6,000 in blank money orders, which represented the proceeds from the sale of pseudoephedrine.

71.   On January 6, 2003, at 4:39 p.m., by telephone and in coded language, Easterling asked defendant MIZYED how much money defendant MIZYED wanted to pay for a storage location which would be used to store the pseudoephedrine.

72.   On January 6, 2003, by telephone and in coded language, defendants MIZYED and T. HAMMAD discussed obtaining pseudoephedrine from coconspirator Dareghrayyeb.

73.   On January 8, 2003, at the international border near Detroit, Michigan, defendant MIZYED attempted to enter Canada with over $100,000 in United States currency.

74.   On January 24, 2003, by telephone and in coded language, defendant MIZYED told Paez-Calderon to tell defendant MAGANA that defendant MIZYED still had his money.

75.   On January 24, 2003, by telephone and in coded language, defendant BALSHEH told S. Mizyed that he was still waiting to complete the pseudoephedrine transaction.

76.   On January 25, 2003, by telephone and in coded language, defendant BALSHEH told defendant MIZYED that the pseudoephedrine suppliers did not want to deal with anyone they did not trust.

77.   On January 31, 2003, by telephone and in coded language, defendant BALSHEH told S. Mizyed that defendant BALSHEH owed money to defendant BALSHEH's pseudoephedrine supplier.

78.   On January 31, 2003, by telephone and in coded

- 13 -

language, defendant MIZYED ordered 150 boxes of pseudoephedrine from defendant BALSHEH and asked if they could be delivered by Tuesday (February 4, 2003) in Toronto, Ontario, Canada.

79.   On February 2, 2003, by telephone and in coded language, defendant BALSHEH told defendant CARPENTER that he could pick up the pseudoephedrine on Tuesday (February 4, 2003).

80.   On February 2, 2003, by telephone and in coded language, defendant MIZYED told Paez-Calderon to inform defendant MAGANA that the pseudoephedrine would arrive on February 7, 2003.

81.   On February 3, 2003, in Ottawa, Canada, defendant GASTON and an unindicted coconspirator loaded 75 boxes of pseudoephedrine from the Sieveright location and an additional 75 boxes from the Hawthorne location.

82.   On February 4, 2003, by telephone and in coded language, S. Mizyed asked defendant MIZYED if defendant BALSHEH had received the money for the pseudoephedrine.

83.   On February 4, 2003, in Mississauga, Ontario, Canada, defendant CARPENTER received 150 boxes of pseudoephedrine from defendant GASTON.

84.   On February 4, 2003, by telephone and in coded language, Farah assured defendant BALSHEH that the transportation of the pseudoephedrine was going well.

85.   On February 5, 2003, at 1:00 a.m., defendant CARPENTER entered the United States from Canada driving a tractor-trailer containing pseudoephedrine destined for Southern California.

86.   On February 5, 2003, in Gary, Indiana, defendant CARPENTER, driving a tractor-trailer containing approximately 150

- 14 -

boxes of pseudoephedrine, delivered the pseudoephedrine to Farah, who then loaded the pseudoephedrine into another tractor-trailer.

87. On February 5, 2003, by telephone and in coded language, Paez-Calderon told defendant MAGANA that the pseudoephedrine would arrive on Friday (February 7, 2003).

88. On February 5, 2003, by telephone and in coded language, S. Mizyed told defendant BALSHEH that Farah would deliver the pseudoephedrine by Friday (February 7, 2003).

89. On February 7, 2003, at 7:00 a.m., in Las Vegas, Nevada, Farah possessed approximately three tons of pseudoephedrine in his tractor-trailer that he intended to deliver to defendant MIZYED.

90. On February 7, 2003, by telephone and in coded language, defendant MAGANA called Paez-Calderon to confirm when the pseudoephedrine would arrive.

91. On February 7, 2003, by telephone, defendant BALSHEH informed S. Mizyed that Farah had been stopped by law enforcement officers with the pseudoephedrine.

92. On February 9, 2003, by telephone and in coded language, S. Mizyed told defendant BALSHEH that Easterling's car had been seized by the police.

93. On February 10, 2003, by telephone and in coded language, Wallace told defendant MIZYED that he did not discuss the recent pseudoephedrine seizure with defendant SARABIA when Wallace last spoke with him.

94. On February 19, 2003, 10:47 a.m., by telephone and in coded language, defendant MIZYED asked Paez-Calderon if defendant

- 15 -

MAGANA had left money for defendant MIZYED.

95.  On February 19, 2003, at 1:30 p.m., by telephone and in coded language, Paez-Calderon informed defendant MIZYED that defendant MAGANA had delivered money for pseudoephedrine to Paez-Calderon for defendant MIZYED.

96.  On February 21, 2003, by telephone and in coded language, defendant MIZYED informed Paez-Calderon that the police had taken all the money orders that an unknown coconspirator had given him to purchase pseudoephedrine.

The Grand Jury further alleges that defendant MIZYED was an organizer, leader, manager, and supervisor in the above-referenced offense, which involved five or more participants and was otherwise extensive due to factors including the number of pseudoephedrine transactions, the quantity of pseudoephedrine possessed and distributed and proceeds generated from its sales, the length of time during which the pseudoephedrine trafficking continued, and the division of labor among the participants.

The Grand Jury further alleges that defendant MIZYED committed the offense while under a criminal justice sentence.

COUNT TWO

[21 U.S.C. § 841(c)(2)]

On or about March 8, 1999, in San Bernardino County, within the Central District of California, defendant TARIQ HAMMAD knowingly and intentionally possessed approximately 57 kilograms of pseudoephedrine, a list I chemical, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a schedule II controlled substance.

- 17 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THREE

[21 U.S.C. § 841(c)(2)]

On or about November 30, 2002, in San Bernardino County, within the Central District of California, defendant GALEB MIZYED knowingly and intentionally possessed approximately 280 kilograms of pseudoephedrine, a list I chemical, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a schedule II controlled substance.

The Grand Jury further alleges that defendant MIZYED was an organizer, leader, manager, and supervisor in the above-referenced offense, which involved five or more participants and was otherwise extensive due to factors including the number of pseudoephedrine transactions, the quantity of pseudoephedrine possessed and distributed and proceeds generated from its sales, the length of time during which the pseudoephedrine trafficking continued, and the division of labor among the participants.

The Grand Jury further alleges that defendant MIZYED committed the offense while under a criminal justice sentence.

- 18 -

## COUNT FOUR

[21 U.S.C. §§ 846, 841(c)(2)]

On or about November 30, 2002, in San Bernardino County, within the Central District of California, defendants SAMUEL BAASCH and HUSSEIN GHACHAM, also known as Chaparro, knowingly and intentionally attempted to possess approximately 280 kilograms of pseudoephedrine, a list I chemical, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a schedule II controlled substance.

COUNT FIVE

[18 U.S.C. §§ 1956(h), 1956(a)(1)]

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown and continuing until on or about April 20, 2003, in Los Angeles and San Bernardino Counties, within the Central District of California and elsewhere, defendants GALEB MIZYED ("MIZYED"), HISHAM HAMMAD ("H. HAMMAD"), ATIYEH ATIYENSALEM ("ATIYENSALEM"), HASAN RASOUL ("RASOUL"), MIEKO JACKSON ("JACKSON"), KENDALL ROBBINS ("ROBBINS"), CHERYL DRENNEN ("DRENNEN") and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to conduct financial transactions, knowing that property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, conspiracy to (1) aid and abet the felonious manufacture of methamphetamine, and (2) distribute pseudoephedrine, a listed chemical, knowing and having reasonable cause to believe the pseudoephedrine would be used to manufacture a controlled substance, with the intent to promote the carrying on of said specified unlawful activity, and to conceal and disguise the nature, location, source, ownership, and control the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), (B)(i).

- 20 -

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

     The object of the conspiracy was to be accomplished in
substance as follows:

     1.   The Grand Jury re-alleges and incorporates by reference
paragraphs 1 through 8 of Count One setting forth the means
described in the conspiracy charged in Count One.

     2.   Defendants MIZYED, ATIYENSALEM, and RASOUL would pool
their funds together to purchase large amounts of
pseudoephedrine.

     3.   Defendant MIZYED would coordinate the transportation of
pseudoephedrine to storage locations in Southern California.

     4.   Defendant MIZYED would contact methamphetamine
manufacturers and collect proceeds from the sale of
pseudoephedrine.

     5.   Defendant JACKSON would send money orders and wire
transfers to defendant MIZYED which had been bought with proceeds
from the sale of pseudoephedrine.

     6.   Defendants H. HAMMAD, JACKSON and DRENNEN would
transport United States currency from California to Illinois.

     7.   Defendant ROBBINS would purchase vehicles for defendant
MIZYED and secure other assets in order to conceal defendant
MIZYED's involvement in pseudoephedrine trafficking.

C.   OVERT ACTS

     In furtherance of the conspiracy, and to accomplish the
object of the conspiracy, defendants MIZYED, H. HAMMAD,
ATIYENSALEM, RASOUL, JACKSON, ROBBINS, DRENNEN, and others known

- 21 -

and unknown to the Grand Jury, committed various overt acts on or about the following dates, within the Central District of California and elsewhere, including but not limited to the following:

97.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 96 of Count One setting forth the overt acts of the conspiracy charged in Count One.

98.  On May 2, 2002, defendant ATIYENSALEM and coconspirator Saleh Mizyed ("S. Mizyed") purchased pseudoephedrine from suppliers in Canada with $50,000 in United States currency hidden inside a secret compartment in their car.

99.  Between July 29 and July 31, 2002, in Los Angeles, California, defendants ATIYENSALEM and RASOUL received proceeds from the sale of pseudoephedrine in the form of money orders.

100. On August 7, 2002, defendant ROBBINS purchased for defendant MIZYED 39 Western Union money orders totaling $17,000.

101. On August 9, 2002, defendant ROBBINS purchased for defendant MIZYED a 2003 Hummer, using $14,000 in United States currency and $11,000 in money orders as a down payment.

102. On August 19, 2002, defendant ROBBINS purchased for defendant MIZYED a 2003 Chevrolet Tahoe, using $4,000 in United States currency and $4,000 in money orders as a down payment.

103. On November 26, 2002, defendant ROBBINS made a payment to Penske Motors for a 2003 Mercedes Benz E500, registered to defendant JACKSON, consisting of $7,200 in United States currency and $9,800 in money orders.

104. On December 4, 2002, defendant ROBBINS made a loan

payment on a the 2003 Chevrolet Tahoe with a $20,000 cashier's check from Bank of America that he purchased with United States currency.

105. On April 10, 2003, by telephone and in coded language, defendant ROBBINS informed defendant MIZYED that he would deliver cellular telephones that defendant ROBBINS had purchased for defendant MIZYED.

The Grand Jury further alleges that defendant MIZYED committed the offense while under a criminal justice sentence.

- 23 -

COUNT SIX

[18 U.S.C. § 1957]

On or about November 26, 2002, in Los Angeles County, within the Central District of California, defendant KENDALL ROBBINS ("ROBBINS") knowingly engaged in a monetary transaction affecting interstate and foreign commerce in criminally derived property of value greater than $10,000, in that defendant ROBBINS made a payment to Penske Motorcars using money orders purchased at 7-11, Vons, the Good Neighbor Liquor, and the Currency Services of California, and United States currency, totaling $17,000, such property having been derived from specified unlawful activity, that is, conspiracy to (1) aid and abet the felonious manufacture of methamphetamine and (2) distribute pseudoephedrine, a listed chemical, knowing and having reasonable cause to believe the pseudoephedrine would be used to manufacture a controlled substance.

COUNT SEVEN

[18 U.S.C. § 1957]

On or about December 4, 2002, in Los Angeles County, within the Central District of California, defendant KENDALL ROBBINS ("ROBBINS") knowingly engaged in a monetary transaction affecting interstate and foreign commerce in criminally derived property of value greater than $10,000, in that defendant ROBBINS made a payment to GMAC using a cashier's check in the amount of $20,000 issued from Bank of America, such property having been derived from specified unlawful activity, that is, conspiracy to (1) aid and abet the felonious manufacture of methamphetamine and (2) distribute pseudoephedrine, a listed chemical, knowing and having reasonable cause to believe the pseudoephedrine would be used to manufacture a controlled substance.

COUNTS EIGHT THROUGH ELEVEN

[18 U.S.C. § 1956(a)(1)]

On or about the following dates, in Los Angeles County, within the Central District of California, defendants GALEB MIZYED and MIEKO JACKSON knowingly and willfully conducted and aided, abetted, counseled, commanded, induced, and procured the following financial transactions affecting interstate and foreign commerce, knowing that the property involved in each of the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, conspiracy to (1) aid and abet the felonious manufacture of methamphetamine and (2) distribute, a listed chemical, knowing and having reasonable cause to believe the pseudoephedrine would be used to manufacture a controlled substance, with the intent to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity:

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| EIGHT | 10/24/02 | Deposit of $5,000 into Washington Mutual Bank Account Number 4404260541 in the name of Mieko Jackson. |
| NINE | 10/24/02 | Deposit of $2,500 into Washington Mutual Bank Account Number 4456634322 in the name of Mieko Jackson. |
| TEN | 10/25/02 | Deposit of $5,000 into Washington Mutual Bank Account Number 4404260541 in the name of Mieko Jackson. |
| ELEVEN | 12/05/02 | Deposit of $9,000.00 into Washington Mutual Bank Account Number 4404260541 in the name of Mieko Jackson. |

///

- 26 -

The Grand Jury further alleges that defendant MIZYED committed the offense while under a criminal justice sentence.

COUNT TWELVE

[21 U.S.C. § 848(a)]

Beginning on an date unknown to the Grand Jury and continuing to on or about April 20, 2003, in Los Angeles and San Bernardino Counties, within the Central District of California and elsewhere, defendant GALEB MIZYED ("MIZYED") unlawfully, knowingly and intentionally engaged in a continuing criminal enterprise in that defendant MIZYED knowingly and intentionally violated provisions of Title 21, United States Code, Sections 841(a)(1), 841(c)(2) and 846, and Title 18 United States Code, Sections 2 and 1956, namely, the felony violations alleged in Counts One, Three, Five, Eight, Nine and Ten of this First Superseding Indictment, which counts are realleged and incorporated herein by reference as if fully set forth in this count, and Title 21, United States Code, Section 843(b), by the use of a communications facility to cause, facilitate, and aid and abet the manufacture of methamphetamine, a schedule II controlled substance, as alleged in overt acts 3-13, 15-16, 18, 23, 25, 27-28, 30, 33, 35-48, 51-52, 54-56, 59-66, 70-74, 76, 78, 80, 82, 94-96, 100-102 and 104-105 of Counts One and Five, which acts are realleged and incorporated herein by reference as if fully set forth in this count, and which violations were part of a continuing series of violations of subchapters I and II of Title 21 of the United States Code, undertaken by defendant MIZYED in concert with at least five other persons with respect to whom defendant MIZYED occupied a position of organizer, supervisor, and manager, and from which continuing series of

- 28 -

violations defendant MIZYED obtained substantial income and resources.

The Grand Jury further alleges that defendant MIZYED is one of several principal administrators, organizers and leaders of the criminal enterprise.

The Grand Jury further alleges that the violations involved at least 300 times the quantity of a substance described in 21 U.S.C. § 841(b)(1)(B), that is, at least 1.5 kilograms or more of methamphetamine, its salts, isomers, and salts of its isomers or at least 15 kilograms or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts or its isomers.

The Grand Jury further alleges that defendant MIZYED committed the offense while under a criminal justice sentence.

COUNT THIRTEEN

[18 U.S.C. § 3]

On or about April 15, 2003, in Los Angeles County, within the Central District of California, defendant GHALIA MIZYED, knowing that an offense against the United States had been committed, namely, conspiring to distribute pseudoephedrine knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, namely, methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(c)(2), received, relieved, comforted and assisted the offender, Galeb Mizyed, in order to hinder and prevent the offender's apprehension, trial and punishment.

A TRUE BILL

_Michael Buthun_
Foreperson

DEBRA W. YANG
United States Attorney

_Sally L. Meloch_
SALLY L. MELOCH
Assistant United States Attorney
Deputy Chief, Criminal Division

PETER A. HERNANDEZ
Assistant United States Attorney
Narcotics Section

- 30 -

**CR 03-398-RMT**
**First Superseding Indictment**

**Count One (1)** - 21:846 (Felony) as to defendants: Galeb Mizyed, Miguel Sarabia, Tariq Hammad, David Gregory Wallace, Amir Fakoury, Ramiro Magana, Samuel Baasch, Hussein Ghacham, Brian Carpenter, Ibrahim Balsheh, Jean-Robert Gaston and Mieko Choniece Jackson

**Count Two(2)** - 21:841 (Felony) as to defendant Tariq Hammad

**Count Three(3)** - 21:841 (Felony) as to defendant Galeb Mizyed

**Count Four(4)** - 21:846 (Felony) as to defendants Samuel Baasch and Hussein Ghacham

**Count Five(5)** - 18:1956 (Felony) as to defendants Galeb Mizyed, Hisham Hammad, Atiyeh Atiyensalem, Hasan Rasoul, Mieko Jackson, Kendall Robbins and Cheryl Drennen

**Count Six(6)** - 18:1957 as to defendant Kendall Robbins

**Count Seven(7)** - 18:1957(Felony) as to defendant Kendall Robbins

**Counts Eight(8) through Eleven(11)** - 18:1956 as to defendants Galeb Mizyed and Mieko Jackson

**Count Twelve(12)** - 21:848 as to defendant Galeb Mizyed

**Count Thirteen(13)** - 18:3 as to defendant Ghalia Mizyed

Miguel Sarabia - Detention/Writ-Warrant
Hisham Hammad - Detention/Warrant
Tariq Hammad - Detention/Warrant
David Gregory Wallace - Detention/Custody
Amir Fakoury - Detention/Warrant
Ramiro Magana - Detention/Warrant
Samuel Baasch - Detention/Writ-Warrant
Hussein Ghacham - Detention/Warrant
Brian Carpenter - Detention/Warrant
Ibrahim Balsheh - Detention/Warrant
Jean-Robert Gaston - Detention/Warrant
Atiyeh Atiyensalem - Detention/Warrant
Mieko Choniece Jackson - $100K secured/Notice
Kendall James Robbins - $100K secured/Notice
Cheryl Drennen - Detention/Warrant
Ghalia Mizyed - $25K/Notice